1

2

3

4

5

6                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
7                                  AT SEATTLE

8

9    OAK HARBOR FREIGHT LINES, INC., a
     Washington Corporation,

10                                                   No.  C05-284Z
                              Plaintiff,

11   v.                                              ORDER

12   SEARS ROEBUCK & CO., d/b/a SEARS
     CONTRACT SALES, a foreign Corporation;
13   and NATIONAL LOGISTICS
     CORPORATION, a foreign corporation,
14
                              Defendants.
15

16          This case comes before the Court on cross-motions for summary judgment filed by

17   Plaintiff Oak Harbor Freight Lines, Inc. ("Oak Harbor"), docket no. 55, Defendant Sears,

18   Roebuck & Co. ("Sears"), docket no. 54, and Defendant National Logistics Corporation

19   ("NLC"), docket no. 58.[1]  Having considered the briefs and declarations in support of and in

20   opposition to the motions, and the oral argument of counsel on February 24, 2006, the Court

21   now enters the following Order, holding Sears and NLC jointly and severally liable to Oak

22

23   [1] Also before the Court is Sears' Motion to Strike the Declaration of Thomas Marcet, docket
     no. 62, which the Court DENIES, as moot.  The Marcet Declaration, which is attached as
24   Exhibit 9 to the Barrette Declaration, docket no. 60, pertains to NLC's claim against Sears
     for over $2.9 million, a claim which is pending in the United States District Court for the
25   Northern District of Illinois and is not pending in this Court.  See Lopez Decl., docket no. 60,
     Ex. Y at 18-26 ¶¶ 3-54 (NLC's Counterclaims I and II in Sears, Roebuck & Co. v. Nat'l
26   Logistics Corp. et al., No. 05 C 2266 (N.D. Ill. filed Apr. 15, 2005)).

ORDER   1–

Harbor for $426,417.94, and holding NLC liable to Sears for $227,202.50 in the event Oak Harbor collects at least $227,202.50 from Sears on Oak Harbor's judgment against Sears and NLC.

## BACKGROUND

### A.    The Parties

Plaintiff Oak Harbor is a Washington corporation and a licenced motor carrier authorized under the Federal Motor Carrier Safety Act, 49 U.S.C. § 13102(12),[2] to provide intrastate and interstate freight transportation services.  Am. Compl., docket no. 47, at 1 ¶¶ 1.1, 2.1.  Defendant Sears is a New York corporation that sells appliances and tools to builders and other bulk purchasers.  Sears' Answer to Pl.'s Am. Compl., docket no. 50, at 2 ¶ 1.2; Sears' Cross-claim, docket no. 31, ¶ 7; Hart Decl., docket no. 56, Ex. E (Reed Dep.) at 18-19.  Defendant NLC is an Illinois corporation and a licensed registered property broker authorized under the Federal Motor Carrier Safety Act, 49 U.S.C. § 13102(2),[3] to arrange transportation by motor carrier for compensation.  NLC's Answer to Pl.'s Am. Compl., docket no. 52, at 2 ¶ 1.3; NLC's Answer to Sears' Cross-claim, docket no. 35, ¶ 5.

The parties have a long history of doing business with each other, as described in more detail below.  In summary, NLC performed brokerage services[4] for Sears in arranging

---

[2]  "The term 'motor carrier' means a person providing commercial motor vehicle (as defined in section 31132) transportation for compensation."  49 U.S.C. § 13102(12).

[3] "The term 'broker' means a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."  49 U.S.C. § 13102(2); see also 49 C.F.R. § 371.2(a) ("Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. . . .").

[4] 49 C.F.R. § 371.2(c) ("Brokerage or brokerage service is the arranging of transportation or the physical movement of a motor vehicle or of property.  It can be performed on behalf of a motor carrier, consignor, or consignee.").

ORDER   2–

for Oak Harbor to haul Sears' freight.  NLC also performed non-brokerage services[5] for

Sears in auditing Oak Harbor's freight bills and collecting funds from Sears to pay Oak

Harbor's freight bills.  Staton Decl., docket no. 59, ¶ 7.

**B.    The Present Case**

Oak Harbor is suing Sears and NLC to recover $426,417.94 that all parties agree Oak

Harbor is owed for transporting Sears' freight between approximately August 1, 2004, and

November 12, 2004.[6]  Am. Compl., docket no. 47, ¶ 2.5.  Oak Harbor incurred these freight

charges in connection with 3,386 shipments that Oak Harbor billed to NLC.  Hart Decl.,

docket no. 56, Ex. F (Fallon Dep.) at 30; Hobby Decl., docket no. 57, ¶¶ 3, 5.  Sears and

NLC each argue that the other party is liable to Oak Harbor for the payment.  Sears argues

that a contract signed in 1992 by NLC and Oak Harbor makes NLC solely liable for Oak

Harbor's freight charges.  NLC argues that the bills of lading used in connection with the

shipments arranged by NLC constitute contracts between Sears and Oak Harbor and that

these contracts make Sears solely liable for Oak Harbor's freight charges.  As discussed

below, the Court concludes that both Sears and NLC are liable under their respective

contracts with Oak Harbor.

Sears has filed a cross-claim against NLC for $227,202.50, an amount that Sears

asserts it has already paid NLC to cover Oak Harbor's freight charges.  Sears' Cross-Claim,

_____

[5] 49 C.F.R. § 371.2(d) ("Non-brokerage service is all other service performed by a broker on behalf of a motor carrier, consignor, or consignee.").

[6] Oak Harbor seeks another $1,959.52 from Sears in connection with shipments of Sears' freight that were arranged by Menlo Logistics after Sears terminated its contract with NLC on November 12, 2004.  Am. Compl., docket no. 47, ¶ 2.6; Hobby Decl., docket no. 57, ¶¶ 2-3.  Oak Harbor has failed to provide sufficient factual and legal support for this claim to meet its burden on summary judgment.  Most notably, the bills of lading used in connection with these shipments are absent from the record.  Accordingly, the Court DENIES the motion for summary judgment as to Oak Harbor's claim against Sears for $1,959.52 allegedly incurred by Oak Harbor in connection with shipments arranged by Menlo Logistics.

ORDER  3–

1   docket no. 31, at 4-5 ¶ 18; Hart Decl., docket no. 56, Ex. F (Fallon Dep.) at 29-31

2   (explaining how the $278,127.17 alleged in Sears' cross-claim was reduced by $50,924.67 to

3   $227,202.50 to reflect NLC's markup on Oak Harbor's freight charges).  NLC responds to

4   Sears' cross-claim by asserting that Sears owes NLC over $2.9 million for freight hauling

5   services rendered between 1995 and 2004.  Staton Decl., docket no. 59, ¶¶ 35-43, Exs. C and

6   D (NLC's invoices to Sears).

7   **C.    NLC's Brokerage Services for Sears**

8        In 1989, Sears began using NLC as a broker to arrange inbound freight transportation

9   services.  Hart Decl., docket no. 56, Ex. A (Oct. 4, 1989 and Nov. 7, 1989 Letters of

10  Understanding[7]) and Ex. G (Staton Dep.) at 11-12; Staton Decl., docket no. 59, ¶¶ 4-5.  As

11  the broker for inbound shipments, NLC identified carriers to move Sears' freight from Sears'

12  vendors, such as GE, Whirlpool and Gold Star, to Sears' warehouses.  Hart Decl., docket no.

13  56, Ex. G (Staton Dep.) at 12; Sears' Exhibits, docket no. 54, Ex. C (Francesconi Dep.) at

14  14, and Ex. E (Chapman Dep.) at 11.

15       In approximately 1990, Sears set up nine regional "mixing" warehouses (i.e.,

16  distribution centers) around the country, including a Seattle-based mixing warehouse, to

17  accept inbound shipments from vendors and to arrange outbound shipments to Sears'

18  customers.  Sears' Exhibits, docket no. 61, Ex. A (Reed Dep.) at 225-227, and Ex. C

19  (Francesconi Dep.) at 20; Hart Decl., docket no. 56, Ex. C (Baxley Dep.) at 155-57, and Ex.

20  E (Reed Dep.) at 34-38, 172; Steinbach Decl., docket no. 61, ¶ 2.  Sears owned the Seattle

21

22  _____

23  [7] Mr. John D. Staton, the President of NLC, testifies that the October 4, 1989 Letter of
    Understanding "was our first contract with Sears . . . [t]urned out to be the only one."  Hart
24  Decl., docket no. 56, Ex. G (Staton Dep.) at 11.  Sears' employees testify that the November
    7, 1989 Letter of Understanding is the operable contract between Sears and NLC.  Sears'
25  Exhibits, docket no. 54, Ex. A (Reed Dep.) at 225; Hart Decl., docket no. 56, Ex. D
    (Steinbach Dep.) at 188-90.  The Court does not decide which letter constitutes the operable
26  contract between Sears and NLC because no party argues that these letters are material to the
    issues before the Court.

ORDER   4–

warehouse, and another company, APL Logistics, managed it.  Hart Decl., docket no. 56, Ex. C (Baxley Dep.) at 12, and Ex. D (Steinbach Dep.) at 157.

In late 1991 or early 1992, Sears expanded the scope of brokerage services that it wanted NLC to provide, and Sears began using NLC as a broker to arrange outbound freight transportation services for its regional mixing warehouses around the country, including the Seattle warehouse.  Hart Decl., docket no. 56, Ex. E (Reed Dep.) at 170-72, 181-82.  As the broker for outbound shipments, NLC identified carriers to move Sears' freight from Sears' warehouses to freight transportation and delivery companies known as "cross-docks."[8]  Hart Decl., docket no. 56, Ex. D (Steinbach Dep.) at 54, Ex. E (Reed Dep.) at 177, and Ex. G (Staton Dep.) at 16, 19; Sears' Exhibits, docket no. 54, Ex. E (Chapman Dep.) at 12.  NLC negotiated rates with the carriers, including Oak Harbor, on an annual basis.  Hart Decl., docket no. 56, Ex. H (Hartmann Dep.) at 35; Staton Decl., docket no. 59, ¶ 16; Sears' Exhibits, docket no. 54, Ex. C (Francesconi Dep.) at 184, Ex. F (Hartmann Dep.) at 152, Ex. H (Jensen Dep.) at 47, and Exs. 15-17, 27, 34-35, 99, 131.  NLC never operated as a motor carrier for Sears.  Staton Decl., docket no. 59, ¶ 8.  In 2001, Sears and NLC discussed a new written contract, but Sears never signed it.  Id. ¶¶ 10-13, Ex. B; Barrette Decl., docket no. 65, Ex. C (correspondence); Hart Decl., docket no. 56, Ex. D (Steinbach Dep.) at 72-73.

**D.**      **Oak Harbor's Transportation of Sears' Freight and the 1992 Carrier Contract**

In late 1991 or early 1992, when Sears began using NLC to arrange outbound shipments from Sears' Seattle warehouse, Sears instructed NLC to work with Oak Harbor. Hart Decl., docket no. 56, Ex. C (Baxley Dep.) at 19-20, 85, and Ex. G (Staton Dep.) at 26.[9]

---

[8] The cross-docks subsequently delivered the freight to Sears' customers.  Hart Decl., docket no. 56, Ex. G (Staton Dep.) at 16.  Sears contracted directly with the cross-docks and paid them directly.  Hart Decl., docket no. 56, Ex. C (Baxley Dep.) at 24; Sears' Exhibits, docket no. 54, Ex. B (Steinbach Dep.) at 142.

[9] Oak Harbor had been transporting Sears' freight since at least 1986.  Hobby Decl., docket no. 57, ¶ 6, Ex. A.

ORDER   5–

1   Sears owned the goods that Oak Harbor hauled.  Hart Decl., docket no. 56, Ex. C (Baxley

2   Dep.) at 59, Ex. D (Steinbach Dep.) at 166, and Ex. E (Reed Dep.) at 219.

3   On January 8, 1992, Oak Harbor and NLC signed a "National Logistics Corporation Carrier

4   Contract" (the "Carrier Contract").  Hobby Decl., docket no. 57, Ex. B.  Sears did not sign

5   the Carrier Contract.  Id.  The Carrier Contract provides, in pertinent part:

> This AGREEMENT between NATIONAL LOGISTICS CORPORATION
> (BROKER/SHIPPER), operating under ICC Broker No. MC205436 and Oak
> Harbor Freight Lines, Inc. (CARRIER), MC # 139763 engaged in the business
> of conducting the transportation of regulated commodities in Interstate
> Commerce over public highways, provides that NATIONAL LOGISTICS
> CORPORATION will offer a series of shipments to the CARRIER, which the
> CARRIER agrees to transport. . . . BROKER/SHIPPER and CARRIER agree
> rates governing shipments will be established to meet the schedules verbally
> agreed upon and verbal agreement will be reduced to writing by CARRIER
> submitting its invoice to BROKER/SHIPPER.  ***SHIPPER agrees to pay
> CARRIER within a predetermined time from date of receipt regardless
> whether or not BROKER/SHIPPER has been paid for movement.*** . . . This
> AGREEMENT shall be effective on the date it is signed and will remain in full
> force and effect from the signing date for twelve (12) months.  Agreement shall
> be automatically extended for successive twelve (12) month terms or until
> canceled by either party by giving written notice to the other party at least
> thirty (30) days prior to the date of termination.

15   Id. (emphasis added).  The Carrier Contract thus identifies NLC as the "Broker/Shipper" and

16   Oak Harbor as the "Carrier."  Id.  The Carrier Contract does not define "Shipper."  Nowhere

17   does the Carrier Contract mention Sears by name.  Id.  Sears had no input into the Carrier

18   Contract.  Sears' Exhibits, docket no. 54, Ex. I (Staton Dep.) at 56.

19   **E.     Bills of Lading**

20        The parties used two different bills of lading for shipments arranged by NLC: (1) the

21   Sears-generated bill of lading for outbound shipments, and (2) the Oak Harbor-generated bill

22   of lading for return shipments.

23            **1.     Bills of Lading for Outbound Shipments**

24        The majority of the shipments for which Oak Harbor is seeking payment were

25   outbound shipments arranged by NLC.  A typical transaction for an outbound shipment

26   transpired as follows.  Sears received a purchase order from a customer and entered the data

ORDER  6–

into Sears' computer system in Augusta, Georgia.  Hart Decl., docket no. 56, Ex. C (Baxley

Dep.) at 11-12, and Ex. D (Steinbach Dep.) at 102-05, 125, 159-60.  Sears then sent the

information to its regional mixing warehouses, where Sears' computer system printed a

unique "Sears Contract Sales Uniform Straight Bill of Lading" from the information

provided.  Hart Decl., docket no. 56, Ex. C (Baxley Dep.) at 12, Ex. D (Steinbach Dep.) at

159-60, 172, and Ex. E (Reed Dep.) at 173-74; see, e.g., Hobby Decl., docket no. 57, Ex. C;

Sears' Exhibits, docket no. 54, Exs. 4 and 21.  Sears designed its bill of lading to comply

with the industry standard, the uniform straight bill of lading.  Hart Decl., docket no. 56, Ex.

C (Baxley Dep.) at 56-57, 118, 120.  The Oak Harbor driver picked up the Sears-generated

bill of lading at the mixing warehouse when he arrived there to pick up the deliveries for that

day.  Hart Decl., docket no. 56, Ex. I (Hobby Dep.) at 14-15.

The Sears-generated bills of lading stated: "Freight Terms: PREPAID."  See, e.g.,

Hobby Decl., docket no. 57, Ex. C; Sears' Exhibits, docket no. 54, Exs. 4 and 21.  These

bills of lading instructed the carrier to: "Send Freight Bills To: National Logistics

Corporation, 495 Commons Drive, Suite 101, Aurora, IL 60504."  Id.  They were marked:

"Domestic," and they each carried a unique bill of lading number as well as a print date.  Id.

They listed business names and addresses for the following categories: "Ship From,"

"Consign To" and "Carrier."  Id.  These bills of lading listed the "Ship From" party as:

"190/SA,[10] APL Logistics, 4798 1st Avenue South, Seattle, WA, 98134, United States."  Id.

These bills of lading did not indicate the "Shipper" or "Consignor" of the goods.  See id.

The "Consign To" party changed, depending on the destination of the shipment.  Id.  These

bills of lading listed the "Carrier" as "Oak Harbor Freight Lines, Box 1469, Auburn, WA,

United States."  Id.  They also included an order number, customer purchase order and

---

[10] Sears used "190/SA" as a code in their computer system to indicate that these bills of
lading, which were generated by Sears in Augusta, Georgia, should be printed at the Seattle
mixing warehouse.  Hart Decl., docket no. 56, Ex. C (Baxley Dep.) at 55-56, 147.

ORDER  7–

customer phone number.  Id.  They noted the commodity being shipped, such as dishwashers, and the quantity and weight of the commodity.  Id.  At the bottom of these bills of lading, they provided: "This document is tendered as an individual Bill of Lading.  All terms and conditions of the straight Bill of Lading and applicable tariff and classifications in effect as of the date hereon apply."  Id.

### 2.   Bills of Lading for Return Shipments

In addition to outbound shipments arranged by NLC, Oak Harbor also hauled Sears' freight for return shipments, moving freight from Sears' customers back to the Sears' Seattle warehouse.  Hobby Decl., docket no. 68, ¶ 5; Hart Decl., docket no. 56, Ex. C (Baxley Dep.) at 114-16, 146-47.  Once Oak Harbor received a Return Authorization from Sears, Oak Harbor generated a bill of lading, using its standard, uniform straight bill of lading form. Hobby Decl., docket no. 68, ¶ 5; see, e.g., Hobby Decl., docket no. 57, Ex. D.  Oak Harbor designed its bill of lading to comply with the industry standard, as set forth in the Rules for Uniform Bill of Lading Terms and Conditions, published on the National Motor Freight Classification ("NMFC") 100-AD form.  Hobby Decl., docket no. 68, at ¶ 5, Ex. D.  These Oak Harbor-generated bills of lading designated "Sears Contract Sales" as the "Consignee." Hobby Decl., docket no. 57, Ex. D.  These bills of lading stated, "Freight Charges Are Prepaid Unless Marked Collect," after which the box next to "Collect" was marked.  Id. "Third Party Billing" was written in the "Bill To" section of these bills of lading.  Id.

### F.   Billing

With regards to billing, the parties typically conducted themselves as follows: 1) Oak Harbor billed NLC at least three days after Oak Harbor delivered the freight, and Oak Harbor expected to be paid by NLC within thirty days of the invoice, Hart Decl., docket no. 56, Ex. I (Hobby Dep.) at 18, 26, 33-34, 183; Sears' Exhibits, docket no. 54, Ex. E (Chapman Dep.) at 74-75, Ex. F (Hartmann Dep.) at 70; 2) NLC audited the freight bills received from Oak Harbor and then billed Sears for the freight charges on a weekly basis, Hart Decl., docket no.

ORDER   8–

56, Ex. G (Staton Dep.) at 68-71; Sears' Exhibits, docket no. 54, Ex. E (Chapman Dep.) at 32-33, 57-58, and Ex. 65; 3) Sears paid NLC approximately five days after NLC billed Sears, Hart Decl., docket no. 56, Ex. G (Staton Dep.) at 87-88; and 4) NLC paid Oak Harbor with funds received from Sears approximately twenty-five days after NLC received the freight invoice from Oak Harbor, id. at 87-88; Sears' Exhibits, docket no. 54, Ex. K (Tagle Dep.) at 41-42; Hart Decl., docket no. 56, Ex. D (Steinbach Dep.) at 169, and Ex. E (Reed Dep.) at 219.  In short, Oak Harbor billed NLC, and NLC billed Sears.  NLC then paid Oak Harbor using Sears' funds.

Tracking the flow of the money from Sears to NLC to Oak Harbor is not as straightforward as the above description of the billing process might imply.  That is because NLC billed Sears for services related to multiple carriers, and Sears wired payments to a common fund from which NLC paid the carriers as the carriers' bills came due.  Hart Decl., docket no. 56, Ex. G (Staton Dep.) at 88-89.  In other words, NLC did not bill Sears separately for Oak Harbor's freight charges, and NLC did not maintain a separate account for Oak Harbor's funds.  See id. at 128-29.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate when the movant demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Once the moving party meets its initial responsibility, the burden shifts to the non-moving

ORDER  9–

1  party to establish that a genuine issue as to any material fact exists.  <u>Matsushita Elec. Indus.</u>

2  <u>Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The non-moving party must

3  present significant probative evidence tending to support its claim or defense.  <u>Intel Corp. v.</u>

4  <u>Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).  Evidence submitted

5  by a party opposing summary judgment is presumed valid, and all reasonable inferences that

6  may be drawn from that evidence must be drawn in favor of the non-moving party.

7  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

8  **B.**    **<u>Oak Harbor v. NLC</u>**

9      Oak Harbor moves for summary judgment against NLC on four legal theories: 1)

10  conversion; 2) constructive trust; 3) resulting trust, and 4) breach of contract.

11      **1.**      **<u>Conversion, Constructive Trust and Resulting Trust Claims</u>**

12      Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain

13  "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.

14  R. Civ. P. 8(a)(2).  Rule 8(f) requires that "[a]ll pleadings shall be so construed as to do

15  substantial justice."  Fed. R. Civ. P. 8(f).  In determining whether a complaint contains

16  sufficient pleadings, the Court "recognize[s] that the main purpose of the complaint is to

17  provide notice to the defendant of what plaintiff's claim is and the grounds upon which the

18  claim rests."  <u>Self Directed Placement Corp. v. Control Data Corp.</u>, 908 F.2d 462, 466 (9th

19  Cir. 1990).  Oak Harbor failed to plead claims for conversion, constructive trust and resulting

20  trust in its Amended Complaint, docket no. 47, and also failed to allege facts giving rise to

21  such claims.  Because Oak Harbor's Amended Complaint did not put NLC on notice of

22  claims for conversion, constructive trust and resulting trust, the Court is precluded from

23  entering summary judgment in favor of Oak Harbor based on these claims.

24      **2.**      **<u>Breach of Contract</u>**

25      Oak Harbor's "Amended Complaint for Monies Due" adequately provided notice to

26  NLC of a breach of contract claim against it.  Am. Compl., docket no. 47, at 2-3 ¶¶ 2.3-2.5.

ORDER   10–

1  Oak Harbor argues that NLC has breached the Carrier Contract by not paying Oak Harbor

2  within thirty days of NLC's receipt of Oak Harbor's freight bills. The Carrier Contract

3  provides, in pertinent part: "SHIPPER agrees to pay CARRIER within a predetermined time

4  from date of receipt regardless whether or not BROKER/SHIPPER has been paid for

5  movement." NLC responds that the term "Shipper" in the Carrier Contract refers to Sears,

6  not NLC.

7      "When interpreting a contract, our primary objective is to discern the parties' intent."

8  Wm. Dickson Co. v. Pierce County, 128 Wn. App. 488, 493 (2005). The Washington

9  Supreme Court has rejected the theory that ambiguity in the meaning of contract language

10  must exist before evidence of the surrounding circumstances is admissible. Berg v.

11  Hudesman, 115 Wn.2d 657, 669 (1990). "Determination of the intent of the contracting

12  parties is to be accomplished by viewing the contract as a whole, the subject matter and

13  objective of the contract, all the circumstances surrounding the making of the contract, the

14  subsequent acts and conduct of the parties to the contract, and the reasonableness of

15  respective interpretations advocated by the parties." Id. at 667 (quoting Stender v. Twin City

16  Foods, Inc., 82 Wn.2d 250, 254 (1973)).

17      The contract defines "BROKER/SHIPPER" as NLC and does not separately define

18  "SHIPPER." The ambiguity arises because the Carrier Contract uses the term "SHIPPER"

19  instead of "BROKER/SHIPPER" only once in the contract – in the sentence regarding the

20  payment obligation. The remainder of the sentence helps the Court discern the parties'

21  intent. First, the sentence states that "SHIPPER agrees . . . ." Sears could not have "agreed"

22  to anything given that it was not a party to, and did not sign, the contract. Second, the

23  sentence states that the payment will occur "within a predetermined time from date of

24  receipt." Because NLC, not Sears, was receiving Oak Harbor's freight bills and was

25  expected to pay them within thirty days, the term "SHIPPER" in the Carrier Contract must

26  mean NLC. Furthermore, the subsequent conduct of NLC and Oak Harbor makes it

ORDER  11–

1    absolutely clear that NLC was expected to pay, and typically did pay, Oak Harbor within

2    thirty days of NLC's receipt of Oak Harbor's freight bills.  The Court concludes that the

3    parties intended the term "SHIPPER" in the Carrier Contract to mean NLC.  Thus, the

4    Carrier Contract imposes a payment obligation on NLC, which NLC has breached by not

5    paying Oak Harbor within thirty days of NLC's receipt of Oak Harbor's freight bills.

6        NLC attempts to avoid liability under the Carrier Contract by arguing that NLC

7    entered the contract as Sears' agent.  This argument fails for multiple reasons.  First, NLC

8    has failed to provide any case law supporting its argument that the definitions of "brokerage

9    services" and "non-brokerage services," see 49 C.F.R. §§ 371.1(c)-(d), automatically make

10   all brokers agents because they act "on behalf of" someone else.  NLC's argument overlooks

11   the definition of broker in 49 U.S.C. § 13102(2), which explicitly states that a broker is a

12   person who acts "as a principal or agent" in arranging for transportation by motor carrier for

13   compensation.  Second, NLC's reliance on Hopkins v. Anderson, 7 Wn. App. 762 (1971), is

14   misplaced.  Hopkins holds that an agent for a disclosed principal does not become a party to

15   a contract.  See Hopkins, 7 Wn. App. at 766.  Hopkins does not apply here because Sears is

16   not a disclosed principal in the Carrier Contract.  Third, NLC has failed to argue that it had

17   actual or apparent authority to bind Sears.  See King v. Riveland, 125 Wn.2d 500, 507

18   (1994) (summarizing agency principles); State v. Morse, 156 Wn.2d 1, 12 n.3 (2005).

19   Fourth, NLC failed to address the numerous cases relied upon by Sears in support of Sears'

20   argument that NLC was acting as an independent contractor who entered the Carrier Contract

21   on its own behalf.  See e.g., Jackson Rapid Delivery Serv., Inc. v. Thomson Consumer

22   Elecs., Inc., 210 F. Supp. 2d 949, 954 (N.D. Ill. 2001) (holding that a broker was acting as an

23   independent contractor, not as a shipper's agent, in entering a contract with a carrier).

24        In conclusion, the Court GRANTS Oak Harbor's motion for summary judgment

25   against NLC and DENIES NLC's cross-motion for summary judgment.  NLC has breached

26   the Carrier Contract's requirement that NLC pay Oak Harbor within a predetermined time

ORDER   12–

1    (i.e., thirty days) of NLC's receipt of Oak Harbor's freight bills.  Even though Oak Harbor

2    has only moved for partial summary judgment against NLC for the amount of $227,202.50,

3    the Court grants Oak Harbor's entire claim against NLC for the amount of $426,417.94.[11]

4    The issues have been fully briefed, and the breach of contract rationale for holding NLC

5    liable does not limit Oak Harbor's recovery.

6    **C.    Oak Harbor v. Sears**

7        Oak Harbor moves for summary judgment against Sears and argues that the bills of

8    lading constitute contracts between Sears and Oak Harbor.

9        **1.    Liability under Default Provisions of Uniform Straight Bill of**

10            **Lading**

11        "The bill of lading is the basic transportation contract between the shipper-consignor

12    and the carrier; its terms and conditions bind the shipper and all connecting carriers."

13    Southern Pac. Transp. Co. v. Commercial Metals Co., 456 U.S. 336, 342 (1982) (involving

14    common carrier by rail); C.A.R. Transp. Brokerage Co. v. Darden Restaurants, 213 F.3d 474,

15    478-79 (9th Cir. 2000) (applying bill of lading contract formation rule of Southern Pacific

16    Transportation Company to case involving motor carriers where the parties adopted the terms

17    of the Uniform Straight Bill of Lading).  "Unless the bill provides to the contrary, the

18    consignor remains primarily liable for the freight charges."  Southern Pac. Transp. Co., 456

19    U.S. at 343.  The consignor may "effectuate its release from liability by executing the

20    nonrecourse clause in the bill of lading."  Id.; see also C.A.R., 213 F.3d at 479.  Under

21    Section 7 of the Uniform Straight Bill of Lading, the consignee (i.e., the party entitled to

22    delivery under a bill of lading) may also be liable for "the freight and all other lawful charges

23    upon the transported property."  C.A.R., 213 F.3d at 478-79.  However, when the shipment

24

25    _____

26    [11] Oak Harbor's Amended Complaint seeks a "[j]udgment against the defendants, *and each of*
     *them*, in the principal amount of $426,417.94 . . . ."  Am. Compl., docket no. 47, at 4 ¶ 1
     (emphasis added).

ORDER   13–

1   has been marked "prepaid" on the bill of lading and the consignee has already paid the

2   consignor for the freight charges, the consignee is not liable to the carrier for payment of the

3   freight charges.  Id. at 479.

4           a.      **The Sears-Generated Bills of Lading for Outbound Shipments**

5           As previously noted, Sears designed its bills of lading for outbound shipments to

6   comply with the industry standard.  These bills of lading expressly stated that "All terms and

7   conditions of the straight Bill of Lading and applicable tariff and classifications in effect as

8   of the date hereon apply."  As a result, the Sears-generated bills of lading clearly adopted the

9   terms of the Uniform Straight Bill of Lading.  It is undisputed that these bills of lading did

10  not include a nonrecourse clause.  Thus, under Southern Pacific Transportation Company

11  and C.A.R., the shipper/consignor is liable for freight charges on these bills of lading.[12]

12          In the briefing, Sears disputes that it is the "shipper" on the Sears-generated bills of

13  lading.  Sears relies on the fact that the Sears-generated bills of lading listed "APL

14  Logistics," not Sears, as the "Ship From" party.  As previously noted, APL Logistics was the

15  manager of the Sears-owned Seattle warehouse.  The testimony of Sears' employee, Mr.

16  Scott Neal, undermines Sears' argument.  Mr. Neal testified that the "Ship From" party

17  indicated the warehouse location from which the goods were shipped; that "[t]he shipper

18  would be the owner of the merchandise;" and that "Sears Roebuck" was the owner of the

19  product.  Barrette Decl., docket no. 65, Ex. B (Neal Dep.) at 141-144.  Mr. Neal's

20  understanding of the meaning of the term "shipper" comports with the presumption in the

21  bills of lading case law that the shipper/consignor is the owner of the goods being shipped.

22  See, e.g., Southern Pac. Transp. Co., 456 U.S. at 337-338 (owner of steel goods is the

23  consignor); C.A.R., 213 F.3d at 476 (owner of shrimp is the shipper).  Moreover, Sears

24  admitted at oral argument that Sears would be liable on the Sears-generated bills of lading if

25

26  _____

[12] Whether the consignee is liable on the Sears-generated bills of lading is not an issue in
    this case.

ORDER   14–

no Carrier Contract existed.  Thus, Sears' only argument for avoiding liability on the Sears-generated bills of lading is that the Carrier Contract trumps the default provisions of the bills of lading (see further discussion below).

### b.  The Oak Harbor-Generated Bills of Lading for Return Shipments

As with the Sears-generated bills of lading, Oak Harbor designed its bills of lading for return shipments to comply with the industry standard.  As previously noted, the Oak Harbor-generated bills of lading were marked "Collect."  The marking of these bills of lading as "collect" nullified the prepaid default provision set forth on the face of the bill of lading.  Thus, under <u>Southern Pacific Transportation Company</u> and <u>C.A.R.</u>, the consignee is liable for freight charges on these bills of lading.[13]  Because the bills of lading designated "Sears Contract Sales" as the "Consignee," Sears is indisputably the consignee.  Sears' only argument for avoiding liability on the Oak Harbor-generated bills of lading is that the Carrier Contract trumps the default provisions of the bills of lading.

### 2.  Freedom to Contract Around Default Provisions of the Bills of Lading

Sears argues that the Carrier Contract trumps the bills of lading and that the bills of lading are mere receipts.  A bill of lading is an "instrument [that] serves both as a receipt and as a contract."  <u>Louisville & N. R. Co. v. Central Iron & Coal Co.</u>, 265 U.S. 59, 67 (1924).  "Ordinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges, and his obligation is ordinarily a primary one."  <u>Id.</u>  However, the carrier and shipper are "free to contract" "when or by whom the payment should be made."  <u>Id.</u> at 66; <u>see also</u> <u>A-Transport Northwest Co. v. United States</u>, 36 F.3d 1576, 1583 (Fed. Cir. 1994) (stating that the bill of lading is not "the exclusive means of creating a contract").  The parties may agree that "the shipper agrees absolutely to pay . . . or . . . that he shall pay if the consignee does not pay . . . or . . . only [the consignee] shall be

---

[13] Whether the shipper/consignor is liable on the Oak Harbor-generated bills of lading is not an issue in this case.

ORDER   15–

1   liable for the freight charges, or both the shipper and the consignee may be made liable."

2   Louisville, 265 U.S. at 66-67.

3          In C.A.R., the Ninth Circuit upheld an agreement between several carriers and a

4   broker that expressly waived the liability of both the shipper (i.e., "Trans-Pac") and the

5   consignee (i.e., "Trans-Pac's customer").  See C.A.R., 213 F.3d at 479.  The agreement,

6   entitled "Waiver of Claim by Subcontractor," provided:

7          The undersigned motor carrier acknowledges and agrees that:

8          1.  It is providing contract carriage services to [Trans-Pac] and/or [Trans-Pac's]
           customer as a subcontractor for another motor carrier or broker;
9
           2. [Trans-Pac] and [Trans-Pac's] customer have made no agreement, express or
10         implied, to pay the undersigned for such services;

11         3.  The Undersigned will not seek payment from [Trans-Pac] or [Trans-Pac's]
           customer for such services; and
12
           4.  To the extent the Undersigned is determined to have any legal right to such
13         payment from [Trans-Pac] or [Trans-Pac's] customer, the Undersigned hereby
           waives such claim.
14

15   C.A.R., 213 F.3d at 476 n.2.  The Ninth Circuit concluded that this "external contract,

16   entered into by the Carriers, lawfully allocated liability for the freight charges," making it

17   unnecessary to "resort to the allocation presumptions on the bill of lading."  Id. at 479.  To

18   further protect its interests, the shipper in C.A.R. also initialed a nonrecourse clause in the

19   bill of lading.  See id. at 476-77.

20          In the present case, the Carrier Contract does not contain any provisions akin to

21   paragraphs two, three and four of the external contract in C.A.R.  In other words, the Carrier

22   Contract does not state that Sears has made no agreement, express or implied, to pay Oak

23   Harbor for its freight services; it does not state that Oak Harbor will not seek payment from

24   Sears for such services; and it does not state that Oak Harbor waives any claim for payment

25   from Sears.  The Carrier Contract does not even mention Sears, by name or implication.  In

26

ORDER   16–

the absence of an unequivocal waiver of Oak Harbor's rights to collect freight charges from Sears, Sears' argument that the Carrier Contract trumps the bills of lading must fail.[14]

In conclusion, the Court GRANTS Oak Harbor's motion for summary judgment against Sears and DENIES Sears' cross-motion for summary judgment.  The terms of the Carrier Contract that make NLC liable to Oak Harbor are not inconsistent with the allocation presumptions on the bills of lading.  The Sears-generated bills of lading for outbound shipments make Sears liable as the shipper/consignor of the goods being shipped, and the Oak Harbor-generated bills of lading for return shipments make Sears liable as the consignee. Sears is liable to Oak Harbor for freight charges at the discounted rates established pursuant to the Carrier Contract.

### 3.    Equitable Estoppel Is Not a Bar to Sears' Liability for $227,202.50

Sears argues that equitable estoppel bars the Court from imposing liability on Sears because it would result in Sears' double payment of the $227,202.50 in freight charges that it has already paid to NLC.  The question is which party, the shipper or the carrier, bears the risk if a middleman (i.e., cargo consolidator, freight forwarder, broker) fails to forward the freight payment to the carrier or if a consignee fails to pay both the shipper and the carrier. The Ninth Circuit has not ruled on the issue, and other circuit courts are split on the question.

In Southern Pacific Transportation Company, the United States Supreme Court discussed the category of "double payment cases" as those which "involved a carrier's misrepresentation, such as a false assertion of prepayment on the bill of lading, upon which a consignee detrimentally relied only to find itself later sued by the carrier for the same freight

---

[14] Sears emphasizes that federal law governing "contract carriers" in effect in 1992 required NLC and Oak Harbor to enter a contract in order for Oak Harbor to charge non-tariff (i.e., discounted) rates and that the Carrier Contract must therefore be the controlling contract. However, at oral argument, Sears admitted that the effect of the Carrier Contract on Sears' liability under the bills of lading would be the same if the Carrier Contract had been entered into after federal law governing "contract carriers" changed in 1995.  Whether NLC and Oak Harbor entered the Carrier Contract to comply with federal law or for other reasons is irrelevant to the present dispute.

ORDER   17–

charges." 456 U.S. at 351.  The Supreme Court referred to <u>Consolidated Freightways</u>

<u>Corporation v. Admiral Corporation</u>, 442 F.2d 56 (7th Cir. 1971), as an example of a double

payment case.  In <u>Consolidated Freightways</u>, the carrier was estopped from collecting against

the consignee because, among other things, the bill of lading marked the freight charges as

prepaid, which led the consignee to accept the delivery of the shipments and promptly pay

the consignor's invoices for the freight charges.  442 F.2d at 59-60.  In contrast, in <u>Southern</u>

<u>Pacific Transportation Company</u>, the Supreme Court found that "no similar double payment

liability is in prospect here" and went on to hold a shipper liable even though the shipper had

not been paid by the consignee.  456 U.S. at 351-52.  The Supreme Court declined to apply

equitable estoppel because the shipper had chosen the consignee, and the shipper had failed

to execute the nonrecourse provision in the bill of lading.  <u>See</u> <u>id.</u>  These cases demonstrate a

concern about the double liability of a *consignee*, not a shipper.  <u>See</u> <u>also</u> <u>Missouri Pac. R.R.</u>

<u>Co. v. Nat'l Milling Co.</u>, 409 F.2d 882 (3d Cir. 1969) (barring a carrier from imposing a

double payment upon a consignee).

Subsequent to <u>Southern Pacific Transportation Company</u>, the Sixth Circuit applied the

doctrine of equitable estoppel to bar a carrier's claim against a *shipper* where the shipper had

already paid a freight forwarder and the freight forwarder never forwarded the money to the

carrier.  <u>See</u> <u>Olson Distrib. Sys., Inc. v. Glasurit Am., Inc.</u>, 850 F.2d 295, 297 (6th Cir.

1988).  The <u>Olson</u> Court reasoned that the shipper relied on the "bill to" provisions of the

bills of lading, which indicated that the carrier would be sending all freight charges to, and

expect payment from, the freight forwarder.  <u>Id.</u>  <u>Olson</u>, however, is an outlier.[15]

---

[15] The Fourth Circuit, in <u>Hawkspere Shipping Co., Ltd. v. Intamex, S.A.</u>, 330 F.3d 225, 237-
38 (4th Cir. 2003), summarizes the double payment cases and indicates that the Eighth
Circuit, in <u>Inman Freight Systems, Inc. v. Olin Corporation</u>, 807 F.2d 117 (8th Cir. 1986),
has joined the Sixth Circuit in <u>Olson</u> in holding that a carrier may be estopped from
collecting freight charges from a shipper who paid freight to a consolidator on a carrier's
representation.  While it is true that the <u>Inman</u> Court did not hold the shipper liable, it was
because the shipper had included a nonrecourse provision in its bill of lading, not because of

ORDER   18–

The Fourth, Eleventh and Fifth Circuits have held that a carrier can recover from a shipper even if the shipper has already paid a freight forwarder.  See Hawkspere Shipping Co., Ltd. v. Intamex, S.A., 330 F.3d 225, 237-38 (4th Cir. 2003); National Shipping Co. v. Omni Lines, Inc., 106 F.3d 1544, 1546-47 (11th Cir. 1997); Strachan Shipping Co. v. Dresser Indus., Inc., 701 F.2d 483, 489-90 (5th Cir. 1983).  These courts have emphasized the policy reasons for holding a shipper liable:

> [W]e think that our result comports with economic reality.  A freight forwarder provides a service.  He sells his expertise and experience in booking and preparing cargo for shipment.  He depends upon the fees paid by both shipper and carrier.  He has few assets, and he books amounts of cargo far exceeding his net worth.  Carriers must expect payment will come from the shipper, although it may pass through the forwarder's hands.  While the carrier may extend credit to the forwarder, there is no economically rational motive for the carrier to release the shipper.  The more parties that are liable, the greater the assurance for the carrier that he will be paid.

Hawkspere, 330 F.3d at 238 (quoting Strachan, 701 F.2d at 490); National Shipping, 106 F.3d at 1547.  "Should the shipper wish to avoid liability for double payment, it must take precaution to deal with a reputable freight forwarder or contract with the carrier to secure its release."  National Shipping, 106 F.3d at 1547.  Shippers may also avoid liability for double payment "by simply paying their carrier directly."  Hawkspere, 330 F.3d at 237.

With respect to the outbound shipments at issue in this case, Sears was the shipper and should be held liable under the Hawkspere, National Shipping and Strachan line of cases.  Sears chose to do business with NLC and directed Oak Harbor, via the Sears-generated bills of lading, to send its freight bills to NLC.  Sears did not protect itself by including a nonrecourse provision in the bills of lading that it generated.  With respect to the return shipments, Sears was the consignee.  Those bills of lading did not include a "prepaid" notation that Sears, as the consignee, could have detrimentally relied upon.  By not insisting on a "prepaid" notation on the Oak Harbor-generated bills of lading, Sears failed to protect itself from double liability for these shipments.  With respect to all of the bills of lading,

---

equitable estoppel.  See 807 F.2d at 121.

ORDER   19–

1   Sears could have protected itself by directly paying Oak Harbor.  Because Sears assumed the

2   risk of double payment, equitable estoppel does not bar Sears' liability to Oak Harbor for the

3   $227,202.50 that Sears has already paid NLC.

4   **D.    Sears v. NLC**

5        Sears has filed a cross-claim against NLC for $227,202.50.  A Sears' accountant, Mr.

6   John J. Fallon, testified that Sears has been billed for and has paid $227,202.50 to NLC to

7   cover Oak Harbor's freight charges for 2,651 of the 3,386 shipments at issue in this case.

8   Hart Decl., docket no. 56, Ex. F (Fallon Dep.) at 5, 20-31.  NLC billed Sears for this subset

9   of Oak Harbor's freight bills through 23 invoices, attached as Exhibits 3-25 to Sears' cross-

10  claim, docket no. 31.  Mr. Fallon testified that Sears has paid NLC's 23 invoices and that

11  these invoices cover the subset of Oak Harbor's 2004 freight charges as documented in the

12  spreadsheet attached as Exhibit 61 to docket no. 54.  Fallon Dep., docket no. 61, Ex. Q at 75-

13  77.  At oral argument, NLC admitted that Sears wired funds to NLC to cover the invoices

14  attached as Exhibits 3-25 to Sears' cross-claim.  Sears' testimony that these invoices cover

15  $227,202.50 of Oak Harbor's unpaid freight charges is unrebutted.  Accordingly, the Court

16  GRANTS Sears' motion for summary judgment against NLC on Sears' cross-claim and

17  DENIES NLC's cross-motion for summary judgment.[16]

18  CONCLUSION

19       The Court ORDERS as follows:

20       1.       The Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion for

21  Summary Judgment, docket no. 55.  The Court grants Oak Harbor's motion against NLC and

22  Sears, holding NLC and Sears jointly and severally liable to Oak Harbor for $426,417.94 in

23  freight charges that were incurred in connection with shipments arranged by NLC.  The

24

25  _____

26  [16] The Court does not decide whether and how much, if anything, Sears owes NLC.  NLC's claim against Sears for over $2.9 million is pending in the United States District Court for the Northern District of Illinois and shall therefore be decided by that Court.

ORDER   20–

1  Court denies Oak Harbor's motion against Sears in connection with the shipments arranged

2  by Menlo Logistics.

3      2.    The Court GRANTS IN PART and DENIES IN PART Sears, Roebuck & Co.'s

4  Motion for Summary Judgment, docket no. 54.  The Court grants Sears' motion as to Sears'

5  cross-claim against NLC.  Sears is entitled to recover in indemnity against NLC any portion

6  of the $227,202.50 that Sears directly pays Oak Harbor.  The Court denies Sears' motion as

7  to Oak Harbor's Amended Complaint.

8      3.    The Court DENIES National Logistics Corporation's Fed. R. Civ. P. 56(a)

9  Motion for Summary Judgment Concerning Sears' Cross-Claim and Concerning Oak

10  Harbor's Complaint, docket no. 58.

11      4.    The Court DENIES Sears' Motion to Strike Declaration of Thomas Marcet,

12  docket no. 62, as moot.

13      5.    The Court SCHEDULES a telephone conference with all of the parties for

14  Thursday, March 30, 2006 at 9:30 a.m. PST for the following purposes: (1) to discuss the

15  entry of the judgments in accordance with this Order; (2) to discuss Oak Harbor's remaining

16  claim against Sears for $1,959.52; and (3) to set a trial date, if necessary.  The parties are

17  directed to set up the call and, once all of the parties are on the line, to call the Court at:

18  (206) 370-8830 at 9:30 a.m. PST.

19      IT IS SO ORDERED.

20      DATED this 2nd day of March, 2006.

21

22                                    Thomas S. Zilly

23                                    Thomas S. Zilly
                                      United States District Judge

24

25

26

ORDER  21–